15409

# DONALD v. METROPOLITAN LIFE INSURANCE COMPANY

(20 S. E. (2d), 395)

8

May, 1941.

*Mr. Yancey A. McLeod* and *Messrs. Elliott, McLain, Wardlaw & Elliott,* all of Columbia, S. C., counsel for appellant,

*Mr. C. T. Graydon* and *Mr. J. Bratton Davis,* both of Columbia, S. C., counsel for respondent,

May 13, 1942.

The majority opinion of the Court, with MR. ASSOCIATE JUSTICE STUKES dissenting, was delivered by MR. CHIEF JUSTICE BONHAM.

On January 26, 1939, the respondent applied in writing to the appellant for a policy of insurance which would indemnify him for a stipulated maximum period during total disability caused by accidental means, at the rate of $50.00 per week. For partial disability he would be paid $25.00 per week. A double indemnity was to be paid in the event of injury incurred while the insured was a passenger in a public conveyance or common carrier.

Contained in the application was the question: "Does your average weekly income *from the above occupation* exceed the aggregate amount of single weekly benefit provided under this and all other policies of accident insurance carried by you?" To this question the respondent answered in the affirmative.

The accident policy was issued immediately, upon the above application. On May 22, 1939, the respondent, Leon D. Donald, commenced this action by the service of a summons and complaint alleging a total disability as a result of an accident sustained while a passenger in a public bus in the City of Columbia, on or about February 25, 1939, and praying weekly benefits in the maximum amount provided by the policy, to wit: $100.00 a week for the 12 weeks which had elapsed between the date of the alleged accident and the commencement of the suit, together with interest thereon.

To this action the appellant, Metropolitan Life Insurance Company, filed its answer, setting up a general denial, and alleging that the respondent, in his application for the policy, had misrepresented the amount of his weekly income as president and general manager of the Columbia Mutual Life Insurance Company.

At the trial of the case before the Honorable A. W. Holman and a jury, in the Richland County Court, each party moved for the direction of a verdict at the close of the evidence. The trial Judge overruled each motion, whereupon the case was presented to the jury, which returned a verdict in favor of the plaintiff-respondent for the full amount

prayed. A motion for a new trial was argued in due time and was overruled by the trial Judge, whereupon an appeal, predicated upon the grounds set forth in the record, was brought to this Court upon the appellant's seven exceptions, of which, in our judgment the determination of the issues raised by the third exception, which we quote here, is controlling of the entire case: "That his Honor erred in refusing to grant defendant's motion for a directed verdict made upon the ground that the only inference which could be drawn from the evidence was that the plaintiff had not received an average weekly income from the stated occupation in excess of the aggregate amount of single weekly benefits as provided under the terms of the policy, and as stated in the application upon which the policy was issued."

It is not denied that in his written application for the policy of insurance, the respondent represented that his average weekly income from his occupation as president and general manager of the Columbia Mutual Life Insurance Company exceeded $50.00, which was the amount of the single weekly benefit provided under the total disability provision of the policy. Therefore, the question here presented is: At the time of the application, did the respondent's average weekly income from the above occupation exceed $50.00?

It cannot be doubted that a misrepresentation on so vital a question in a policy of this nature would be justification for voiding the policy. Such policies are issued primarily for the purpose of indemnifying the insured in part for loss of income by reason of an accident. No insurance company would willingly issue such a policy of insurance for loss of income in excess of actual income, for such an arrangement would provide no incentive for the insured to return to work upon his recovery, so long as he received a larger income by remaining idle.

It is impossible to believe that the appellant in this case would have issued its policy if the respondent had answered

"No" to this question. Certainly, it had the right to rely upon the truth of the respondent's answer, and to reject the application in the event of a negative answer. Furthermore, the Courts have held that where there is such misrepresentation, on the strength of which a policy is issued, such a policy is voidable. In the case of *Southern Surety Co. of New York v. Fortson,* 44 Ga. App., 329, 161 S. E., 679, on page 684, it was held by the Court of appeals of Georgia: "In the instant case, the pleadings show the following controlling facts: The plaintiff signed a written application to the defendant company for a policy of accident insurance. Question 9 of the application was: 'Does your income per week exceed the gross amount of single weekly indemnity under all policies carried and now applied for by you.' The answer to this question as written in the application was 'Yes.' Question 10 of the application was: 'What accident or sickness insurance have you? (Give names of insurers and amounts of indemnity).' The answer as written in the application was 'None.' * * * At the time of the signing of the application by the plaintiff, he had a policy of accident insurance issued by another company providing for a weekly indemnity of $30.00, and the policy of insurance applied for provided for a monthly indemnity of $100.00, the total amount of indemnity provided for in the two policies being approximately $220.00 a month. When the application was signed, the plaintiff was employed by the Washington Loan & Banking Company as an assistant cashier at a salary of $150.00 a month, and had no other income. These facts clearly show that the answers to questions 9 and 10 of the application were untrue. The defendant company in its answer set up as a defense to the action those false representations made in the application; that the representations were both false and material; and that therefore the policy of insurance sued upon was null and void, and the plaintiff was not entitled to recover. A copy of the application was attached to the policy of insurance delivered

to the plaintiff. In our opinion, it is manifested that if questions 9 and 10 of the application had been correctly answered, the application would have been rejected and no policy of insurance would have been issued."

As in the case above quoted, a copy of the application was attached to the policy in the present instance. It is stated in the policy before us that in addition to the agreed premium, it is issued "in consideration of the statements in the application," which thus became a part of the contract between the parties.

With reference to his occupation with the Columbia Mutual Life Insurance Company, the respondent testified:

"Q. So you acted as president, general manager and agent? A. Yes, sir.

"Q. In other words, you were the whole cheese? A. The whole cheese, yes, sir."

Upon the trial, the annual reports which by requirement of law were filed by the Columbia Mutual Life Insurance Company with the Insurance Commissioner of this State, covering the years 1936, 1937 and 1938, were received in evidence. The last of these reports, for the year 1938, was filed less than one month after the respondent applied to the appellant for the policy of accident insurance, the said report having been sworn to by the respondent on the day before his alleged accident. That report disclosed a total of $2,775.60 to have been received by the company through collection of premiums or membership fees, and that of this sum $933.00 was paid out on losses on policies, $310.00 on loss adjustment expenses, a total of $308.00 in payment of miscellaneous itemized expenses, and $1,200.00 in the form of agent's commissions, leaving a balance on hand of $24.60. Based on this report, and assuming that the respondent received the entire amount paid as agent's commissions, his income for the entire year from his occupation would have been only $1,200.00, or about $23.00 per week, which

amounts to less than half the represented income of more than $50.00 per week.

A similar situation was revealed for the previous year, 1937, during which the annual report, sworn to by the respondent, shows that $2,148.34 was paid for "Salaries— Officers and Clerks." The remaining assets of the company were $29.45. Assuming that the respondent received the total sum paid in the form of salaries to officers and clerks, his weekly income for that year fell far short of exceeding the prescribed income in excess of $50.00 per week. Similarly, during the year 1936, as shown by the annual report for that year, the respondent received a maximum income not exceeding $1,314.68, even though it be assumed that he personally received all salaries shown to have been paid to officers and clerks, and all commissions shown to have been disbursed to agents.

The respondent testified, on cross examination, that during a part of the year 1938, the company of which he was president and general manager had four or five agents who wrote some part of the insurance issued by that company, and that such agents received fifty per cent. of the premiums on the insurance they wrote. The respondent testified further on cross examination with reference to his income during the year 1938:

"Q. So you wrote all but $800.00? A. I would say something like that.

\* \* \*

"Q. That would leave $4,200.00 and you got 50% of that. What did you get out of the premiums you collected? A. I got about $60.00 a week.

"Q. I am asking what percentage of the premiums did you yourself collect, or that you put in your pocket? A. All except what I paid out for expenses.

"Q. In other words, you were the insurance company? A. Yes, sir.

"Q. And when you took in a premium, you put it in your pocket? A. What I didn't take to run the business.

"Q. How did you pay the losses? A. I just paid the losses.

"Q. If it went in your pocket, you could not pay the losses? A. It was a very small mutual insurance company.

"Q. You took in $5,000.00 premiums, approximately, during 1938. How many losses did you have during 1938? A. I cannot tell you.

\* \* \*

"Q. So you had 1,000 policies outstanding at some time during 1938 and you paid expenses and overhead and put the rest of the $5,000.00 in your pocket? A. Yes, sir.

"Q. What was your overhead? A. I don't know.

"Q. Was it $1,000.00? A. I don't know.

"Q. You don't remember anything about your business? A. I cannot tell you that.

"Q. Assuming that there was $1,000.00 worth of policies outstanding, you didn't hold anything in reserve to pay the policies, if a loss came along? A. I kept some money.

"Q. How much? A. Maybe $50.00, maybe $200.00. I kept it so I could have it if I wanted it.

\* \* \*

"Q. Suppose you had had a series of losses, what would you have done? A. That is what closed the company up.

\* \* \*

"Q. So it (the report) must be correct? A. No, sir.

"Q. Did you swear to something that was not correct? A. Yes, sir.

\* \* \*

"Q. If you put more in your pocket than the Insurance Department said you should do, if you had taken the proper amount of those premiums that you collected and put them in the reserve where they should be, you could not have made $60.00 a week, could you? A. No."

It seems clear to us that the respondent himself has shown that his income was not in excess of $50.00 per week as pre-

scribed by the application which was a part of the policy, and that he himself showed further that a large part of the funds which he received was not his personal income, but that it was money of the Columbia Mutual Life Insurance Company which was in his hands by reason of his position with that company.

Certainly, the contract between the appellant and the respondent contemplated actual income derived legally and legitimately, and not the personal use by him of the premiums collected, his appropriation of which, as the respondent admitted, resulted in the closing of the company.

The use of funds as income to which one is not entitled is comparable to a lawyer stating that his income was a certain amount, whereas his calculation was based largely upon funds in his possession belonging to his clients. In fact, as admitted by the respondent, had his company sustained a serious loss, it would have been necessary for him to pay the same out of his pocket, thus reducing the income which he contends that he had earned.

Black's Law Dictionary, 3d Ed., page 944, contains several definitions of income. Among them we find:

" 'Income' is the gain which proceeds from labor, business or property; * * * or the amount of money coming to a person or corporation within a specified time, whether as payment for services, interest, or profit from investment, its usual synonyms being 'gain,' 'profit,' 'revenue.'

\* \* \*

"Something derived from property, labor, skill, ingenuity, or sound judgment, or from two or more in combination, or from some other productive source.

\* \* \*

·" 'Income' is the gain derived from capital, from labor, or from both combined; something of exchangeable value, proceeding from the property, severed from the capital, however invested or employed *and received or drawn by the re-*

*cipient for his separate use, benefit, and disposal."* (Italics added.)

While the language of the foregoing definitions does not specifically distinguish between income that is legitimate or otherwise, we cannot conceive that the contract between the appellant and the respondent in this case contemplated anything other than legitimate income; nor could this Court sanction such a contract if illegally acquired income had been contemplated, because such a contract would be contrary to the public policy of the State.

The representation as to the respondent's income became a part of his contract with the appellant, under which the appellant would be liable to indemnify him in the agreed amount only in the event that such representation were true; otherwise the contract, containing this clear, unequivocal and unambiguous language, would be voidable.

This Court has repeatedly held that where only one reasonable inference can be drawn from the testimony, the question becomes a matter of law. In the case at bar the contract is plain, clear, unambiguous, and is as binding upon the respondent as it is upon the appellant.

In the case of *Brown v. Mutual Life Insurance Co. of New York,* 186 S. C., 245, at page 252, 195 S. E., 552, at page 555, this Court said:

"It is now settled law that the parties are bound by the terms of their contract and in the absence of obscurity or ambiguity the terms of the contract will be understood and enforced in their plain and clear sense. *Parker v. Jefferson Standard Life Insurance Co.,* 158 S. C., 394, 155 S. E., 617. * * *

"The parties have the right to make their own contracts and when such contracts are capable of clear interpretation the Court's duty is confined to the enforcement thereof; it cannot exercise its discretion as to the wisdom of such contract or substitute its own for that which was agreed upon. * * * "

This Court held similarly in the case of *Walker v. Commercial Casualty Insurance Co.*, 191 S. C., 187, 4 S. E. (2d), 248. In the case of *Kittles v. General American Life Insurance Co.*, 182 S. C., 162, at page 174, 188 S. E., 784, at page 789, this Court said:

" 'Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense. [Citing cases.] * * * And to discharge the insured from the legal consequences of a failure to comply with an explicitly stipulated requirement of the policy, constituting a condition precedent to the granting of such relief by the insurer, would be to vary the plain terms of a contract in utter disregard of longsettled principles.'

"The doctrine thus announced has been consistently followed and applied by this Court, * * *."

Likewise, in the case of *Patterson et al. v. Courtenay Manufacturing Co. et al.* 196 S. C., 515, at page 527, 14 S. E. (2d), 16, at page 21, this Court said:

"It is now a question of the construction of a contract between the Cotton Mill and the insurance carrier. This Court has repeatedly held that it must be bound by the terms of a contract brought before it for construction."

In the present case, the application, which was made by the respondent himself, a copy of which was attached to the policy, and which formed a part of the consideration for the policy, was an integral part of the contract between the parties. Such a situation is clearly distinguishable from that involved in the recent case of *Brandt v. Standard Mutual Life Association*, 199 S. C., 247, 19 S. E. (2d), 105, 107, in which the insured was held not to be bound by certain by-laws which were not a part of the contract. In that case this Court said: "It is undisputed that the insured's policy did not contain the by-laws of the association, nor was he furnished a copy thereof. It does not appear

that he was ever served with a copy of the by-laws authorizing this extra assessment,   *   *   *."

Had the by-laws in that case been attached to the policy and formed a part of the consideration, the insured would have been bound by them, just as the respondent is bound by his application in the instant case.

It may be admitted, as is contended by counsel for the respondent, that it was incumbent upon the appellant to show that the respondent had not complied with the terms of his contract. In the light of the testimony, in our opinion this fact has been clearly shown, regardless of where the burden of proof may have lain.

Let the judgment be reversed, and the case remanded to the Richland County Court with instruction to enter judgment for the appellant.

MESSRS. ASSOCIATE JUSTICES BAKER and FISHBURNE and CIRCUIT JUDGE L. D. LIDE, ACTING ASSOCIATE JUSTICE, concur.

MR. ASSOCIATE JUSTICE STUKES (dissenting) : I am sorry that I do not agree with the conclusion reached by the Chief Justice in this case. It seems to me that it could have been reasonably inferred from the evidence that the plaintiff's statement with reference to his earnings in the application for insurance was not false; and that the jury so concluded, which was within their province.

The insured's testimony was unequivocal that he was averaging $60.00 per week in earnings from his occupation as president, manager and agent for a small insurance company at the time that the defendant issued the policy to him upon which the suit was brought. To combat this the defendant depended upon the report of operations filed in the office of the State Insurance Commissioner purporting to cover the calendar year 1938 from which the gross premium receipts of plaintiff's little company appeared to be only about $2,800.00. However, plaintiff testified that this report was prepared by a man whom he thought to be connected with the office of the commissioner and it appears that during

the first of the trial counsel on both sides also had this erroneous impression; and plaintiff's testimony was to the effect that the report was only for one quarter of the year so that the annual receipts of his company were much more, he said over $5,000.00, out of which he paid losses and operating expenses and pocketed the balance. It is not shown that in the latter he violated any law or established public policy. *Weeks v. New York Life Insurance Co.*, 128 S. C., 223, 122 S. E., 586.

As is well said in appellant's brief: "The respondent vigorously denies the accuracy of the foregoing reports, and particularly that for the year 1938, and contends that the 1938 report was for a quarter year only." His testimony in this respect is corroborated by that of an examiner from the office of the commissioner, a witness for the defendant, who testified on cross examination that the report must have been erroneous for it showed less gross receipts than in the former year although more than twice the amount of insurance was in force in 1938.

Under all of the evidence, particularly that above referred to, I think that the most that the defendant was entitled to was a submission of the issue to the jury, which it had under very clear instructions and the verdict was against it. I therefore think that this Court cannot properly pass upon this issue of fact in this, a law case.

The defendant pleaded as an affirmative defense in its answer this alleged misrepresentation on the part of the insured and unquestionably the burden of the proof of the defense in all its several elements was upon the appellant. 29 Am. Jur., 1078, Insurance, Par. 1440. 33 C. J., 107, insurance, Par. 827. A similar situation was presented in *Murphy v. National Travelers' Benefit Association*, 179 Iowa, 213, 161 N. W., 57, 60 L. R. A., 1917-C, 338, and the Court found, upon the question of the direction of verdict for the plaintiff, as the jury did in this case, and said: "It is for the defendant to show that he [the insured] did not [earn the

amount stated in his application], and to establish such evidentiary fact of bad faith, falsehood, or deception the proof must be clear, satisfactory, and convincing.".

The *Georgia case* relied upon by appellant and cited in the decision of the Chief Justice, *Southern Surety Co., of New York, v. Fortson,* 44 Ga. App., 329, 161 S. E., 679, involved very different facts from those here present. In it the plaintiff stated in the application that he had no other disability insurance when as a matter of fact he had, and the total benefits accruing from it and from the policy then applied for considerably exceeded his salary, other than which he had no income. Here we have conflicting evidence as to the earnings of the insured, an issue thereabout submitted to the jury and a verdict sustaining his contention that he did have the income which he stated in the application.

As indicated, I think the judgment founded on the verdict of the jury should be affirmed.